NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-862

ADOPTION OF LINCOLN (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial in the Juvenile Court, the judge found the mother unfit to parent Lincoln, Amy, and Beth, and terminated her parental rights to them.  On appeal, the mother challenges the trial judge's determination of unfitness; she also contends that the Department of Children and Families (department) improperly suspended her visitation with the children after the department assumed custody of them.  We affirm.

Background.  The department initiated a care and protection action as to Lincoln and Amy in 2018, and a separate care and protection as to Beth in 2019.  The department obtained temporary custody of each of the children, but in May 2019, Beth, the youngest of the children, was placed back in the

_____

[1] Adoption of Amy and Adoption of Beth.  The children's names are pseudonyms.

conditional custody of the mother. Approximately two weeks later, the mother violated the conditions and Beth was returned to the temporary custody of the department. The two care and protection actions were consolidated in early 2020.

The first trial on the consolidated petitions resulted in a mistrial. A second trial began in September 2022 and continued over nine nonconsecutive dates. In February 2023, the judge issued decrees adjudicating the mother unfit and terminating her parental rights to all three children. The judge approved the department's adoption plans for Amy and Beth but did not terminate the parental rights of the father of Lincoln.[2] This appeal followed.

Discussion. 1. Unfitness. We have reviewed the judge's findings and rulings and are satisfied that he applied the correct legal principles in adjudicating the consolidated petitions. "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'" Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011). "While a decision of unfitness must be supported by clear and convincing evidence, a judge's

---

[2] None of the children's fathers have appealed.

2

findings will be disturbed only if they are clearly erroneous" (citation omitted).  Adoption of Paula, 420 Mass. 716, 729 (1995).  "Moreover, the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference."  Custody of Eleanor, 414 Mass. 795, 799 (1993).  Whether termination of parental rights is in a child's best interests is a discretionary decision.  See Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).

Here, the judge's "'specific and detailed' findings," which the mother does not challenge as erroneous, "demonstrate [the mother's] parental unfitness clearly and convincingly." Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021), quoting Custody of Eleanor, 414 Mass. at 799.  The judge found that the mother failed to complete most of the tasks included on her action plan -- prominently, the requirement that she engage in mental health[3] and anger management services -- and that she did not provide the department with the releases necessary to confirm those services in which the mother represented that she did participate.  See Adoption of Luc, 484 Mass. at 147, quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987) ("mother's unwillingness

---

[3] The judge also cited extensively to the mother's trial testimony as "indicative of [her] instability and paranoia."

3

to adhere to [the department's] service plan, which required her to obtain treatment for her mental health challenges . . . is 'relevant to the determination of unfitness'"); Adoption of Yvonne, 99 Mass. App. Ct. 574, 581 (2021) (judge's unchallenged findings concerning mother's lack of engagement with services supported judge's determination of unfitness). Although the mother did complete required parenting classes, the judge found that her participation in them did not help her to recognize the ways that her mental illness interfered with her parenting ability or the traumatic effects of her anger on the children.[4] See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019), quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, supra (parent's failure to benefit from services "relevant to the determination of unfitness").

We have carefully considered the mother's argument that both the department and the judge placed a misogynistic and racist cast on her anger, penalizing the mother for being "too persistent in seeking her rights or disagreeing with [the department]." We are not persuaded. The judge found that during the department's involvement with the mother and the children, the mother engaged in an ongoing pattern of verbal and physical threats, physical violence, and the use of hateful

_____

[4] Indeed, the mother testified that she learned from them "[n]othing that I didn't know before."

4

invective against department workers and others.  These findings were based on both the department's evidence and the mother's own testimony.[5]  See Adoption of Yvonne, 99 Mass. App. Ct. at 580 (mother's "concerning behaviors" including threats to department staff and difficulty handling frustrations in front of children relevant to unfitness determination).

The judge also considered the mother's conduct through the lens of her past history with the courts, exclusive of the care and protection actions.  For example, he found that on seven different occasions between 2012 and 2020, at the request of five different individuals, harassment prevention orders or abuse prevention orders were issued against the mother.  See Adoption of Xarissa, 99 Mass. App. Ct. 610, 618-619 (2021) (parent's experience as both victim and perpetrator of domestic violence relevant to judge's assessment of parental fitness). The mother's trial testimony included her acknowledgement that some of the orders were the result of her own conduct: "[People] bother me and then they call the police when it's time for them to be bothered back."

---

[5] It is evident from the judge's findings that his assessment of the mother's parental unfitness did not turn on either the mother's simply being "upset" or "loud," or her response to being required to remain outside Lincoln's school in the rain with the newborn Beth when she arrived early for a visit with Lincoln.

5

The judge also considered the mother's many contacts with the criminal justice system. See Adoption of Larry, 434 Mass. 456, 469 (2001) (past parental conduct relevant to parental fitness "where the evidence supported the continuing vitality of such conduct"). Although the judge was careful to distinguish the few arrests that led to convictions from the majority of the charges which were dismissed, he properly noted that during the mother's adult life, her behavior had resulted in her being arrested more than thirty times on charges including carrying a dangerous weapon, disorderly conduct, disturbing the peace, assaultive offenses, resisting arrest, malicious destruction of property, and violation of a harassment prevention order. Notably, this list included 2018 charges for assault and battery by means of a dangerous weapon and assault and battery on a family or household member in which Lincoln was alleged to have been the victim. Although that charge was dismissed, and the mother denied certain details of the underlying allegation, at trial the mother testified that she had thrown a plastic spray bottle at Lincoln.

The judge expressed concern about the mother's ability to communicate positively or productively with the department, service providers, and others, including the children. Specifically, the judge found that the mother used e-mail to send a department social worker a series of messages that

included racial epithets, profanity, and comments about the worker's appearance, knowing that the e-mails were abusive. He likewise found that the mother resorted to screaming, yelling, and swearing -- at school personnel, department personnel, the children, and at trial -- as a form of communication. In October 2019, the mother and a friend became so verbally aggressive toward department staff during a visit with the children that a police officer was required to be present for the mother's subsequent visits.

Significantly, the judge found that in more than one instance, the mother's verbally aggressive behavior upset the children and the mother either did not recognize the effect of her actions on the children or did not take responsibility for it. In 2019, when her telephone conversation with Lincoln devolved into her screaming at Lincoln and left the child in tears, the mother dismissed her own role in the child's dysregulation. She "indicated that [Lincoln] cries for everything and that she did not believe [Lincoln] was crying because of [her] behavior, but because of his own behaviors." See Adoption of Luc, 484 Mass. at 146 n.17.

Finally, the judge's decision to terminate the mother's parental rights reflected his consideration of the mother's inconsistent history of visits with the children, the limited bonds between the mother and the children, and the existing

bonds between Amy and Beth and their respective preadoptive parents.  See G. L. c. 210, § 3 (c); Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. at 289 ("the refusal of the parents to maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit are relevant to the determination of unfitness"); Adoption of Rhona, 63 Mass. App. Ct. 117, 126-127 (2005) (judge required to consider bond between child and preadoptive parent in making unfitness determination).

The mother argues that she was the victim of racial bias but points to no facts supporting that contention; on review of the trial transcripts and the judge's findings, we find no basis to disturb the decrees on that ground.  Likewise, the mother's arguments that the judge terminated her rights because she was "a minority woman," because she challenged the department's decisions, or because she was a "common scold" are unavailing. The judge in this case properly assessed "a constellation of factors" in determining that the mother was permanently unfit to parent the children and that termination of her parental rights was in the children's best interests.  Adoption of Yvonne, 99 Mass. App. Ct. at 582, quoting Adoption of Greta, 431 Mass. 577, 588 (2000).  We are satisfied that decision met the relevant requirements by clear and convincing evidence and discern no reason to disturb it.

2.  Custody and visitation.  The department assumed
emergency custody of Beth, the youngest child, as a newborn,
before she left the hospital.  See G. L. c. 119, § 24.  She was
returned to the mother's custody subject to certain conditions
and, when the mother violated those conditions, a judge revoked
the order of conditional custody and returned custody of Beth to
the department.  The mother's challenges to the original removal
and the judge's use of the conditional custody order form were
not raised in the trial court and are therefore waived.[6]  See
Adoption of Larry, 434 Mass. at 470.  Even if that were not the
case, to the extent that the mother argues that these custody
determinations violated the department's regulations, see 110
Code Mass. Regs. § 7.128 (2008), or were otherwise improper, her
contentions lack legal support and do not rise to the level of
appellate argument.  See Mass. R. A. P. 16 (a) (9) (A), as
appearing in 481 Mass. 1628 (2019).

Finally, our evaluation of the mother's argument that "[the
department] stopped providing visits" is hindered by the
mother's failure to include any citations to the relevant
portions of the record.  Understanding the argument to relate to

---

[6] The mother did petition a single justice of this court two
separate times in connection with Beth's removal from her
custody.  The propriety of those orders is not before us, see
McMenimen v. Passatempo, 452 Mass. 178, 192 (2008) (collecting
cases on limited scope of appeal from order under G. L. c. 231,
§ 118), and we do not comment on it.

the lack of visits between the mother and the children in the months leading up to the trial, we are not persuaded. The judge's findings detail the mother's intermittent attendance at visits between 2019 and 2022; by August 2022, neither Lincoln nor Amy wished to attend visits with the mother, although Lincoln continued to do so.

On November 7, 2022, the mother told the ongoing social worker that "she was done" and would not attend any more visits with the children. Although the mother quickly reversed her stance, and the department continued to offer visits, a visit with Lincoln and Beth on December 1, 2022, ended badly after the mother refused to speak to either child. The mother did not participate in any visits between December 1, 2022, and the trial at issue in this appeal; we read the judge's findings to import his determination that the mother or the children chose not to participate in visits after December 2022, not that the department "suspended" the mother's right to visitation with the children. The department did not fail in its duties by deferring to the children's preference not to participate in visits. See Adoption of Daisy, 77 Mass. App. Ct. 768, 783 (2010), S.C. 460 Mass. 72 (2011) ("[department] was not

in a position to force eleven year old child to attend visits against her will").

Decrees affirmed.

By the Court (Desmond, Hand & Grant, JJ.[7]),

*Anne M. Thomas*

Assistant Clerk

Entered:  May 2, 2024.

---

[7] The panelists are listed in order of seniority.